**POMERANTZ LLP**
Jeremy A. Lieberman (pro hac vice)
Austin P. Van (pro hac vice)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
avan@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Lead Plaintiff*

*Additional Counsel on Signature Page*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| IN RE CYTOKINETICS, INCORPORATED SECURITIES LITIGATION | CASE NO. 3:25-cv-07923-RFL<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Hon. Rita F. Lin |

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 3

III. PARTIES ..... 4

A. Lead Plaintiff ..... 4

B. Defendants ..... 4

1. Cytokinetics, Incorporated ..... 4

2. Robert I. Blum ..... 4

3. Sung H. Lee ..... 4

IV. BACKGROUND ..... 5

A. Company Background ..... 5

B. NDA Approval Process ..... 5

C. REMS Requirement ..... 7

D. Cytokinetics' Development of Aficamten ..... 7

E. Mavacamten, Aficamten's Sole Competitor Drug, Required a REMS ..... 8

V. DEFENDANTS MISLED INVESTORS TO BELIEVE THAT CYTOKINTICS HAD SUBMITTED A REMS WITH ITS NDA FOR AFICAMTEN ..... 9

A. Defendants Misled Investors to Believe that Cytokinetics Would Submit a REMS with Its Aficamten NDA ..... 9

B. Analysts Made Clear That They Understood Cytokinetics To Have Promised To Submit a REMS with the NDA for Aficamten ..... 9

C. Defendants Announced that They Had Submitted an Aficamten NDA That "Contained a Distinct Risk Mitigation Approach Specific to Aficamten" ..... 11

D. Defendants Stated that the Success of Aficamten Depended on "the Imposition by FDA . . . of a REMS Program That Is Differentiated" ..... 12

E. Analysts Continued To Make Clear That They Understood Cytokinetics To Have Promised That It Submitted a REMS with the NDA for Aficamten ..... 14

F. When Defendants Disclosed that They Had Not Submitted a REMS for Aficamten, Analysts Were "Shocked" and Cytokinetics Share Price Plummeted 15

1. May 1, 2025 Disclosures ..... 15

2. May 6, 2025 Disclosures ..... 18

VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ..... 19
A. August 8, 2024 ..... 20
B. November 7, 2024 ..... 20
C. February 27, 2025 ..... 21
VII. LOSS CAUSATION ..... 22
A. May 1, 2025 ..... 22
B. May 6, 2025 ..... 23
VIII. ADDITIONAL SCIENTER ALLEGATIONS ..... 23
A. Defendants Have Admitted That They Crafted Their Misstatements Deliberately with Full Knowledge That the Aficamten NDA Was Submitted Without a REMS ..... 23
B. Defendants Have Admitted That They Had Decided Prior to August 8, 2024 Not To Submit Aficamten with a REMS ..... 24
C. Defendants Knew That the FDA Would Almost Certainly Require a REMS for Aficamten Because Defendants Knew About the FDA's REMS for Camyzos ..... 25
D. The FDA's Approval of Aficamten Was a Core Operation of the Company ..... 26
IX. CLASS ACTION ALLEGATIONS ..... 27
X. COUNT ONE ..... 29
XI. COUNT TWO ..... 32
XII. PRAYER FOR RELIEF ..... 33
XIII. JURY DEMAND ..... 33

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| **Class Period** | Between August 8, 2024 and May 5, 2025, inclusive |
| **Company** | Cytokinetics, Incorporated |
| **Cytokinetics** | Cytokinetics, Incorporated |
| **Defendants** | Cytokinetics, Incorporated, Robert I. Blum and Sung H. Lee |
| **Exchange Act** | Securities Exchange Act of 1934 |
| **FDA** | U.S. Food and Drug Administration |
| **FE** | former employee |
| **HCM** | hypertrophic cardiomyopathy |
| **Individual Defendants** | Robert I. Blum and Sung H. Lee |
| **Lead Plaintiff or Plaintiff** | Gilbert Rosenthal |
| **NASDAQ** | NASDAQ Stock Market |
| **NDA** | New Drug Application |
| **oHCM** | obstructive hypertrophic cardiomyopathy |
| **PDUFA** | Prescription Drug User Fee Act |
| **REMS** | Risk Evaluation and Mitigation Strategy |
| **SEC** | United States Securities and Exchange Commission |
| **SEQUOIA-HCM** | Safety, Efficacy, and Quantitative Understanding of Obstruction Impact of Aficamten in HCM |

Plaintiff Gilbert Rosenthal ("Plaintiff"), individually and on behalf of all other persons similarly situated, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel and his counsel's investigator, which included: (a) review and analysis of relevant filings made by Cytokinetics, Incorporated ("Cytokinetics" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Cytokinetics' public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) interviews of former employees of Cytokinetics; and (e) information readily obtainable on the internet. Plaintiff believes that further evidentiary support will exist for these allegations after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Cytokinetics common stock between August 8, 2024 and May 5, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2. Cytokinetics is a biopharmaceutical company focused on developing, and commercializing its leading drug candidate, aficamten. Aficamten is a cardiac myosin inhibitor designed to treat obstructive hypertrophic cardiomyopathy, a condition where the heart muscle thickens, leading to obstructed blood flow. Aficamten aims to reduce cardiac muscle contractility to improve blood flow. Beginning in 2024, Cytokinetics informed investors that it intended to submit a New Drug Application ("NDA") to the FDA for approval to market aficamten.

3. The FDA typically approves NDAs for drugs with risks of serious adverse consequences, such as certain heart drugs like aficamten, only after approving the drug sponsor's Risk Evaluation and Mitigation Strategy ("REMS") that the sponsor submits with the NDA. A REMS typically includes conditions, such as patient monitoring and prescriber training, that aim to mitigate the severe risks of the drug. The only drug comparable to aficamten—Bristol Myers

Squibb's mavacamten—was submitted for FDA approval with a REMS and approved only after the FDA reviewed and approved the REMS.

4. Throughout the Class Period, Defendants repeatedly misled investors to believe that Cytokinetics had submitted a REMS with its NDA for aficamten, when in fact, Defendants were fully aware that Cytokintics had intentionally not submitted a REMS with the application.

5. For example, Defendants stated that their submitted NDA contained a "distinct risk mitigation approach specific to aficamten." This statement misled analysts to believe that Cytokinetics had submitted a REMS with its aficamten NDA. There is no formal vehicle for submitting a "risk mitigation approach" with an NDA other than by submitting a REMS. Indeed, multiple analysts documented in their public reports on the Company that they understood this statement to convey that Cytokinetics had submitted a REMS with its NDA for aficamten. That is, this statement by Defendants *demonstrably* misled investors, as evidenced in their reports.

6. Similarly, the Company stated that the success of aficamten depended on "the imposition by FDA . . . of a REMS program that is differentiated." As the FDA only imposes a REMS if a proposed REMS has been submitted by the drug sponsor, this statement directly implied to investors that Cytokinetics had submitted a REMS to the FDA (one that was differentiated from the REMS for mavacamten).

7. By misleading investors to believe that Cytokinetics had submitted a REMS with its aficamten NDA, Defendants concealed the likelihood that the FDA's approval timeline for the aficamten NDA would be delayed by months once the FDA determined that a REMS was wrongly omitted and required time to review it.

8. The truth began to emerge on May 1, 2025, when Cytokinetics announced for the first time that it had failed to submit a REMS with its aficamten NDA. The Company announced that the FDA had extended the Prescription Drug User Fee Act ("PDUFA") action date for aficamten's NDA from September 26, 2025 to December 26, 2025 to review the REMS newly submitted at the FDA's request after the initial NDA filing. Analysts quickly published reports universally expressing "shock" and "surprise" that, contrary to Defendants' representations, Cytokinetics had not submitted a REMS with its NDA for aficamten. These reports specifically

criticized Cytokinetics "poor communication" and lack of "transparency" with "investors" and demanded to know why they were not informed that no REMS has been submitted in the initial NDA. On this news, Cytokinetics' stock price plummeted by $5.57 per share, or 12.97%, to close at $37.35 per share on May 2, 2025.

9. Then, on May 6, 2025, during an earnings call, CEO Robert I. Blum provided additional details about the Company's failure to submit a REMS with the aficamten NDA. Defendant Blum admitted that the Company had multiple meetings with the FDA prior to submitting the aficamten NDA at which they discussed safety monitoring and risk mitigation, but that the Company nevertheless had chosen deliberately not to submit a REMS with the aficamten NDA. These statements confirmed that Defendants were fully aware that the Company had not submitted a REMS with the aficamten NDA, and so knew fully well that their statements to investors implying the contrary were false and misleading. Cytokinetics' stock price fell further by $0.93 per share, or 2.73%, to close at $33.04 per share on May 7, 2025.

10. As a result of Defendants' false and misleading statements, Plaintiff and other Class members purchased Cytokinetics' common stock at artificially inflated prices and suffered significant losses when the truth was revealed. Defendants' conduct violated the federal securities laws, and Plaintiff seeks to recover damages on behalf of the Class.

## II. JURISDICTION AND VENUE

11. Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

12. The claims asserted arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14. Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b), as Defendant Cytokinetics is headquartered in this District and a significant portion of

its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

15. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

### A. Lead Plaintiff

16. Lead Plaintiff Gilbert Rosenthal purchased Cytokinetics common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Cytokinetics was previously filed. *See* Dkt. No. 20.

### B. Defendants

#### 1. Cytokinetics, Incorporated

17. Cytokinetics, Incorporated is a Delaware corporation with its principal executive offices located at 350 Oyster Point Boulevard, South San Francisco, CA 94080. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "CYTK."

#### 2. Robert I. Blum

18. Defendant Robert I. Blum ("Blum") was, at all relevant times, the Chief Executive Officer and President of Cytokinetics, as well as a Director on the Board of Directors of Cytokinetics.

#### 3. Sung H. Lee

19. Defendant Sung H. Lee ("Lee") was, at all relevant times, the Chief Financial Officer of Cytokinetics.

20. Defendants Blum and Lee are sometimes referred to as the "Individual Defendants." Cytokinetics together with the Individual Defendants are referred to as the "Defendants."

21. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Cytokinetics' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

22. Cytokinetics is liable for the acts of the Individual Defendants and Cytokinetics employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful act alleged in this complaint were carried out within the scope of their employment with authorization. The scienter of the Individual Defendants, and other employees and agents of the Company, are similarly imputed to Cytokinetics under respondeat superior and agency principles.

## IV. BACKGROUND

### A. Company Background

23. Cytokinetics is a biopharmaceutical company focused on discovering, developing, and commercializing muscle activators and muscle inhibitors as potential treatments for diseases in which muscle performance is compromised. The Company's research and development efforts are directed toward addressing cardiovascular and neuromuscular diseases.

24. Cytokinetics' lead drug candidate, aficamten, is a cardiac myosin inhibitor designed to treat obstructive hypertrophic cardiomyopathy ("oHCM"), a condition where the heart muscle thickens, leading to obstructed blood flow and symptoms such as shortness of breath, chest pain, and fatigue. Aficamten aims to reduce cardiac muscle contractility, thereby improving blood flow and alleviating symptoms. During the Class Period, Cytokinetics was in the process of seeking FDA approval to market aficamten by submitting a New Drug Application ("NDA") for review.

### B. NDA Approval Process

25. The NDA application is the vehicle through which drug sponsors formally propose that the FDA approve a new pharmaceutical for sale and marketing in the U.S.

26. The drug development process begins with preclinical research, where the drug is

tested in laboratories and on animals to assess its safety and biological activity. Once preclinical testing is completed, the drug enters Phase 1 clinical trials, which involve a small group of patients and focus primarily on assessing the drug's safety, dosage range, and pharmacokinetics. In Phase 2, the focus shifts to evaluating the drug's effectiveness in treating a specific condition. Phase 3 clinical trials are the most extensive and involve a larger patient population. These trials are designed to confirm the drug's effectiveness, monitor side effects, and compare it to standard or equivalent treatments. The data collected during Phase 3 is critical for the eventual NDA submission. After successful completion of Phase 3 trials, the drug sponsor compiles all clinical and preclinical data, along with manufacturing details, into an NDA and submits it to the FDA.

27. The NDA review process typically takes about one year. During this time, the FDA rigorously evaluates the data to determine whether the drug should be approved for marketing. The FDA's NDA review timeline is structured into distinct phases, each with specific objectives and milestones.

28. The filing review is the first phase of the FDA's evaluation of an NDA. During this period, spanning the first 60 days following submission, the FDA will review the application to make sure it is complete and that all referenced data and documents have been provided. If the FDA determines that the application is robust enough to be reviewed, they will send the sponsor a letter formally acknowledging that the NDA has been filed.

29. Once the FDA accepts an NDA for filing, the FDA sets a Prescription Drug User Fee Act ("PDUFA") date, which is a deadline for the FDA to issue its formal approval decision. The PDUFA date is set at ten months for standard review, or six months for priority review.

30. During the review phase, the FDA assigns a multidisciplinary team of experts, including specialists in medicine, pharmacology and statistics, to assess the drug's safety, efficacy and quality. A key component of this phase is the advisory committee meeting. This meeting brings together external experts to provide an independent assessment of the NDA.

31. On or before the PDUFA date, the FDA will issue a decision. The possible outcomes include approval, which allows the drug to enter the market, or a complete response letter, which indicates that the application cannot be approved in its current form. Alternatively,

the FDA may request additional information or studies to resolve outstanding issues.

**C. REMS Requirement**

32. For medications with serous safety concerns (for example, certain heart medications), the FDA may only approve the drug with an accompanying Risk Evaluation and Mitigation Strategy ("REMS"), a drug safety program that helps ensure the benefits of the medication outweigh its risks. The drug sponsor develops the individual REMS program and submits it to the FDA for approval. The FDA does not develop a REMS program for a drug itself. A REMS is the only formal vehicle for submitting a risk mitigation approach to the FDA as part of an NDA.

33. A REMS may impose post-marketing conditions on a drug. Post-marketing conditions imposed by a REMS are often burdensome to the prescriber and patient, such as requirements that a prescriber be certified to prescribe the drug, or that the patient engage in routine laboratory or in-office testing for adverse effects. In contrast, post-marketing conditions imposed outside of a REMS are burdensome only to the sponsor, such as required studies and clinical trials that sponsors conduct after approval to gather additional information about a product's safety, efficacy or optimal use.

**D. Cytokinetics' Development of Aficamten**

34. The development of aficamten has been the central focus of Cytokinetics' business for years. The Company has conducted multiple clinical trials, including the SEQUOIA-HCM Phase 3 trial (Safety, Efficacy, and Quantitative Understanding of Obstruction Impact of Aficamten in HCM), to evaluate aficamten's safety and efficacy in patients with oHCM.

35. On December 27, 2023, Cytokinetics issued a press release announcing positive topline (*i.e.*, initial) results from the SEQUOIA-HCM Phase 3 clinical trial. The press release explained that the results of SEQUOIA-HCM showed that treatment with aficamten significantly improved exercise capacity compared to placebo, and that statistically significant and clinically meaningful improvements were observed in all ten prespecified secondary endpoints.

36. On February 27, 2024, Cytokinetics published a press release in which it stated that it had convened meetings in February with the FDA to discuss the topline results of the SEQUOIA-

HCM trial and to prepare for the NDA submission for aficamten. The Company also noted that it had engaged in commercial readiness activities for aficamten, including market research with HCM patients and customer account profiling, and held initial conversations with specialty pharmacies and patient hub providers. The Company stated that they expected to submit an NDA to the FDA in Q3 2024.

37. On May 13, 2024, Cytokinetics published a press release announcing primary (*i.e.*, final) results from the SEQUOIA-HCM trial. According to the Company, the primary results from the SEQUOIA-HCM trial confirmed the top-line test results and showed that treatment with aficamten for 24 weeks significantly improved exercise capacity compared to placebo.

**E. Mavacamten, Aficamten's Sole Competitor Drug, Required a REMS**

38. Aficamten's only direct competitor drug is mavacamten (brand name Camzyos), which is marketed by Bristol Myers Squibb. The FDA approved mavacamten in April 2022 to treat oHCM. As part of its approval, the FDA imposed a burdensome REMS on mavacamten due to risks of left ventricular systolic dysfunction and heart failure from the drug. The REMS program requires that patients enroll in the Camyzos REMS and receive regular in-office echocardiogram monitoring. Likewise, healthcare providers must be certified in the Camyzos REMS in order to prescribe Camyzos.

39. That Camyzos was subject to a REMS was well-publicized and broadly recognized by stock analysts. Given that the imposition of a REMS for one drug in a category strongly suggests the FDA will impose a REMS for similar drugs in that category, these analysts recognized that a REMS for Camyzos strongly suggested that the FDA would likewise impose a REMS on Cytokinetics' similar drug, aficamten, and stated as much in public reports referenced below.

## V. DEFENDANTS MISLED INVESTORS TO BELIEVE THAT CYTOKINTICS HAD SUBMITTED A REMS WITH ITS NDA FOR AFICAMTEN

### A. Defendants Misled Investors to Believe that Cytokinetics Would Submit a REMS with Its Aficamten NDA

40. On August 8, 2024, Cytokinetics issued a press release reporting second quarter 2024 financial results. As part of the press release, Cytokinetics detailed the Company's NDA submission for aficamten:

> Participated in a Type B meeting with the U.S. Food and Drug Administration (FDA) to discuss potential strategies related to safety monitoring and risk mitigation for *aficamten* and included a review of how results from SEQUOIA-HCM and intrinsic properties of *aficamten* may inform risk mitigation. The Company expects to propose a distinct risk mitigation approach specific to *aficamten* with the New Drug Application (NDA) for which the rolling submission is underway. The Company is on track to complete the rolling NDA submission for *aficamten* in Q3 2024.

41. As noted below, investors and analysts understood Cytokinetics' statement that it "expects to propose a distinct risk mitigation approach specific to *aficamten* with the New Drug Application (NDA)" to mean that Cytokinetics would submit a REMS with its NDA, just as Bristol Myers Squibb had submitted a REMS with its NDA for mavacamten. There is no formal vehicle for submitting a "risk mitigation approach specific to [a drug]" as part of an NDA other than a "risk evaluation mitigation strategy"—the REMS is the standard vehicle for submitting a risk mitigation approach to the FDA as part of an NDA.

42. In fact, as explained below, at the time Cytokinetics made this statement, it had already met with the FDA and had already determined that it would not submit a REMS with its NDA for aficamten.

### B. Analysts Made Clear That They Understood Cytokinetics To Have Promised To Submit a REMS with the NDA for Aficamten

43. On August 8 and 9, 2024, immediately after Cytokinetics' issued its press release stating that it would "propose a distinct risk mitigation approach specific to *aficamten* with the New Drug Application (NDA)," multiple analysts issued reports stating their understanding that Cytokinetics had announced an intention to file a REMS with its NDA for aficamten. In particular,

multiple analysts made abundantly clear that they understood Cytokinetics' promise to include a "distinct risk mitigation approach" in the NDA for aficamten as a promise that the Company would include a REMS for aficamten—sophisticated, reasonable investors understood the phrase "distinct risk mitigation approach" to refer to a "REMS."

44. Analysts Carter Gould and Leon Wang at the globally renowned bank Barclays issued a report titled, "Aficamten Submission Expected in 3Q; REMS Strategy and FOREST Amendment Supportive of Case for Differentiated REMS." In this report, the analysts stated that they understood Cytokinetics to have given "tangible REMS updates" for the aficamten NDA, namely that Cytokinetics "*plan[ned] to propose a new aficamten-specific REMS as part of the submission*."

> That there was a tangible update here will likely be positively received: **Cytokinetics detailed plans to propose a *new aficamten-specific REMS as part of the submission***, which at least felt a bit more substantive of a takeaway than the typical one-sided non-committal FDA feedback dance.

45. Analysts Serge Belanger and John Gionco of Needham published a report titled, "Rolling Afi[camten] NDA Submission Underway; FDA Appears Open to More Lenient REMS." The report stated:

> We believe the **main news of the update** centered around the **recent FDA meeting to discuss** strategies related to safety monitoring and **a *REMS for afi[camten]***. While it will remain an FDA review issue, **CYTK will propose a *distinct risk mitigation approach* specific to afi[camten]'s data with the NDA**.
>
> [. . .]
>
> CYTK met with FDA as part of a Type B meeting to discuss risk mitigating strategies for afi[camten] including a review of how SEQUOIA-HCM results and intrinsic properties of aficamten could inform the REMS approach. **While *risk mitigation/REMS* will remain an FDA review issue, CYTK plans to propose a distinct risk-mitigation approach specific to afi[camten] as part of the NDA submission**.

46. Other analysts also noted that they had understood Cytokinetics' press release to mean that Cytokinetics would be applying in its aficamten NDA for a differentiated REMS. Analyst Jeffrey Hung at Morgan Stanley issued a report titled, "2Q24 Results: FOREST-HCM Protocol Amendment Supports Potential for Differentiated REMS." In this report, Morgan Stanely noted that "less frequent monitoring in FOREST-HCM provides external validation that aficamten

may secure less stringent REMS," and that "risk mitigation will be a review topic [for the FDA] as the company plans to propose a mitigation approach in its NDA unique to aficamten." These statements suggest that Morgan Stanley analysts as well understood from Cytokinetics' press release that the Company would be submitting a REMS with its NDA, albeit one that was differentiated from its competitor's REMS.

47. Analysts at Truist Securities similarly noted:

> We are bullish on the path forward for aficamten following "productive" type B meeting with the FDA . . . . We continue to see **potential for *less onerous REMS***. [. . .] **Company plans to propose a risk mitigation approach specific to aficamten** with the NDA . . . .

48. In this statement as well, sophisticated analysts made clear that they understood Cytokinetics' statement that it would propose a "risk mitigation approach specific to aficamten" to mean that the Company would be submitting a REMS with its NDA, albeit potentially a less onerous REMS that that imposed on mavacamten.

### C. Defendants Announced that They Had Submitted an Aficamten NDA That "Contained a Distinct Risk Mitigation Approach Specific to Aficamten"

49. On November 7, 2024, Cytokinetics released their quarterly report on SEC Form 10-Q for the third quarter of 2024 "(2Q 2024 10-Q".). In the 2Q 2024 10-Q, Defendants stated:

> **Camzyos® was approved by FDA with a** comprehensive and mandatory **risk evaluation and mitigation strategy (REMS)**, including all or many of the elements to assure safe use (ETASU) that are contemplated in Section 505-1(f)(3) of the U.S. Food, Drug & Cosmetics Act. **Our proposed NDA as submitted to FDA contained a distinct risk mitigation approach specific to aficamten.** We believe that the commercial prospects of aficamten will be highly dependent on whether FDA approves aficamten with a label and/or **post-marketing conditions that are less onerous to prescribers and patients than the ETASU REMS applicable to Camzyos®**.

50. These statements further misled investors to believe that Cytokinetics had submitted a REMS with its NDA for aficamten. Cytokinetics stated that their submitted NDA contained a "distinct risk mitigation approach specific to aficamten," and as noted above, investors rightly understood this phrase to convey that Cytokinetics had submitted a REMS with its NDA for aficamten, albeit a REMS that was distinct from the REMS for Camyzos (mavacamten).

51. These statements implied that Cytokinetics would be submitting a REMS with its NDA for aficamten in a second way as well. As noted above, post-marketing conditions that are onerous on patients are imposed only through a REMS—other post-marketing conditions, imposed outside of a REMS (such as follow-up studies) are onerous only to the drug sponsor. The statements above contemplated that the submitted NDA for aficamten could be accepted with "post-marketing conditions" that could impose some burden on patients, and so suggests that the NDA for aficamten was submitted with a REMS.

52. As detailed below, Defendnats later outright admitted that, at the time of these misstatements, they were fully aware that Cytokinetics had not submitted a REMS with the NDA for aficamten.

53. On December 2, 2024, Cytokinetics issued a press release announcing that the FDA accepted the Company's NDA for aficamten for the treatment of oHCM. Particularly, the press release detailed that the FDA assigned the NDA a standard review with a PDUFA target action date of September 26, 2025 and that the FDA was not currently planning to hold an advisory committee meeting to discuss the application.

### D. Defendants Stated that the Success of Aficamten Depended on "the Imposition by FDA . . . of a REMS Program That Is Differentiated"

54. On February 27, 2025, Cytokinetics released its annual report on SEC Form 10-K for the fourth quarter and year of 2024 ("2024 10-K"). In the 2024 10-K, Defendants stated:

> The commercial success of aficamten will be highly dependent on differentiation of aficamten from Camzyos®. **Camzyos® was approved by FDA with a** comprehensive and mandatory **REMS**, including all or many of the elements to assure safe use (ETASU) that are contemplated in Section 505-1(f)(3) of the U.S. Food, Drug & Cosmetics Act. **Our proposed NDA as submitted to FDA contained a distinct risk mitigation approach specific to aficamten**. We believe the commercial prospects of aficamten are highly dependent on whether FDA approves aficamten with a label and/or post-marketing conditions that are less challenging to prescribers and patients than the REMS applicable to Camzyos®.
>
> We believe that our ability to successfully compete will depend on, among other things:
>
> [. . .]
>
> - **the imposition by FDA** or other regulatory authorities **of a REMS program that is differentiated and less burdensome** to healthcare

> providers, pharmacists and patients **than the REMS program to which Camzyos® is subject**;

55. These statements once again misled investors to believe that Cytokinetics had submitted their NDA for aficamten with a REMS, this time in at least three ways. *First*, as in their previous misstatements, Cytokinetics stated that their submitted NDA contained a "distinct risk mitigation approach specific to aficamten," and investors rightly understood this phrase to convey that Cytokinetics had submitted a REMS with its NDA for aficamten—one that was differentiated from the Camyzos REMS. *Second*, as with Cytokinetics' November 7, 2024 misstatement, the statements above contemplated that the submitted NDA for aficamten could be accepted with "post-marketing conditions" that could impose some burden on patients, and so suggested that the NDA for aficamten was submitted with a REMS. *Finally*, Defendants' new statement that "we believe our ability to successfully compete will depend on . . . the imposition by FDA . . . of a REMS program that is differentiated" implied that the FDA would impose some REMS for aficamten (one that was potentially differentiated), and so implied that Cytokinetics had submitted a REMS for aficamten for the FDA to consider and impose. As noted above, the FDA does not draft a REMS for a sponsor—the FDA imposes a REMS only after reviewing a REMS proposed by the drug company. Accordingly, in stating that the success of aficamten depended on the FDA's accepting a REMS for aficamten that was differentiated, Defendants directly implied that Cytokinetics had submitted a REMS for aficamten.

56. The same day, Defendants further cemented the misleading impression that Cytokinetics had submitted a REMS with its aficamten NDA during their earnings call with investors. On the February 27, 2025 earnings call, analyst James Condulis from Stifel asked Defendant Blum a "quick question on the REMS" for aficamten.

> [W]anted to get your thoughts on if you expect mavacamten's REMS to be eased in the U. S. as well and sort of if that happens like how does that change how you sort of think about the range of scenarios for kind of **what aficamten's REMS looks like**?
>
> Again, sort of like in that scenario, **would you define differentiated REMS as** still **differentiated in** sort of **the maintenance setting** as well? **Or** does that become more about some of the **other aspects of the REMS**?

57. In this question, the analyst Condulis clearly conveyed his understanding that "aficamten's REMS" had been submitted with the aficamten NDA, such that the relevant question was how aficamten would have a "differentiated REMS" from mavacamten's REMS. Not only did Defendant Blum do nothing to correct Condulis' misimpression that an "aficamten's REMS" existed and had been submitted with the NDA, but Blum also encouraged it. Defendant Blum replied:

> **[T]here are points of differentiation** that we continue to believe are quite meaningfully important for aficamten as are consistent with intrinsic properties. And echo frequency is one of those, but so are there several others.[1]

58. In this statement, read in context as a direct response to Condulis' question, Defendant Blum implied that there were points of differentiation between "aficamten's REMS" and "mavacamten's REMS," and so misleadingly implied that a REMS for aficamten existed and had been submitted as part of the aficamten NDA.

59. Again, as detailed below, Defendnats later outright admitted that, at the time of these misstatements, they were fully aware that Cytokinetics had not submitted a REMS with the NDA for aficamten.

### E. Analysts Continued To Make Clear That They Understood Cytokinetics To Have Promised That It Submitted a REMS with the NDA for Aficamten

60. Analysts continued to express their understanding that Cytokinetics had submitted a REMS with its NDA for aficamten. For example, on April 6, 2025, analysts at Piper Sandler published "takeaways" from their publicly videotaped "fireside chats" at their Virtual Cardio Symposium that month. For Cytokinetics, the analysts stated their understanding that "*CYTK thinks aficamten's next-in-class profile will obtain a differentiated REMS/label* into September 26, 2025 PDUFA." Here again, sophisticated analysts recorded their understanding, based on Cytokinetics' misleading statements, that Cytokinetics had submitted a REMS with its NDA for aficamten, such that the FDA could approve that REMS in September 2025.

---

[1] "Echo frequency" refers in this context to how often a patient requires an echocardiogram to monitor for potential side effects on the heart from medications like aficamten or mavacamten.

### F. When Defendants Disclosed that They Had Not Submitted a REMS for Aficamten, Analysts Were "Shocked" and Cytokinetics Share Price Plummeted

#### 1. May 1, 2025 Disclosures

61. On May 1, 2025, after market hours, Cytokinetics published a press release announcing for the first time that Cytokinetics had not submitted a REMS with the aficamten NDA. The company stated that the FDA had extended the PDUFA action date for the NDA for aficamten from September 26, 2025 to December 26, 2025 because additional time was required to conduct a full review of the Company's newly proposed REMS. As part of the press release, Cytokinetics stated:

> Following pre-NDA discussions with FDA in which safety and risk mitigation were discussed, Cytokinetics submitted the NDA for aficamten in oHCM without an accompanying REMS, and the FDA accepted the NDA for filing. Recently, during the NDA review, the FDA requested that Cytokinetics submit a REMS, based on the inherent characteristics of aficamten, which the company provided. The submission of a REMS has now been determined by FDA to be a Major Amendment to the NDA resulting in a standard three-month extension to the original PDUFA action date.

62. In these statements, Cytokintics revealed that, contrary to Defendants' earlier representations, Cytokinetics had submitted the NDA for aficamten without a REMS, so the original PDUFA date would have to be extended to permit the FDA time to review the newly submitted REMS. The statement makes clear that Cytokinetics had submitted the REMS only "recently" as of May 1, 2025.

63. Investors and analysts reacted immediately to Cytokinetics' revelation. The price of Cytokinetics' common stock plummeted $5.57 per share, or approximately 13%, to close at $37.35 on May 2, 2025, on unusually heavy trading volume.

64. As detailed below, analysts quickly published reports universally expressing "shock" and "surprise" that, contrary to Defendants' representations, Cytokinetics had not submitted a REMS with its NDA for aficamten. These reports specifically criticized Cytokinetics "poor communication" and lack of "transparency" with "investors" and demanded to know why they were not informed that no REMS has been submitted in the initial NDA.

65. On May 1, 2025, J.P. Morgan issued a report titled "PDUFA for Aficamten in oHCM Extended 3mo to Dec. 26, 2025." In the article, analyst Tessa Romero wrote that J.P. Morgan was "shocked" by the news that Cytokinetics had submitted its NDA for aficamten "**without**" a REMS:

> *We are very surprised* by the announcement that the FDA extended the PDUFA date for aficamten . . . , but, more specifically, what *we are even more perplexed* by is *that Cytokinetics had submitted the NDA* for aficamten in oHCM **without** *an accompanying REMS "following pre-NDA discussions with FDA in which safety and risk mitigation were discussed."*
>
> Quite frankly, *we are shocked by this* as are investors based on initial feedback; the announcement as well as the timing of it are odd to us and we would highlight that the company recently had said that they were on track for a late-cycle meeting in June. We also would note prior comments from mgmt that they have been in dialogue with the REMS Oversight Committee (ROC) since before the NDA filing and further flagged at our investor event (March 30, 2025) that there had been no turnover in the ROC or review groups to their knowledge; recall, mgmt also indicated having a Type B meeting in 2Q24. Publicly, mgmt has stated its expectation for a differentiated label and risk mitigation profile for some time . . . . We will await further detail on the company's 1Q25 conference call/release on May 6th which will be the first opportunity to listen to mgmt for color on their decision-making given they are in a quiet period (i.e., *why not submit an accompanying REMS from the get-go*), and their interactions with the FDA, but in the meantime wonder if this setback could limit performance in the mid-term.

(Bold and underline emphasis in original.)

66. Analysts at Barclays published a similar report on May 1, 2025 titled "Aficamten PDUFA Delay Surprising; Eyes on May 6 Earnings Call." The report stated that the news that the NDA for aficamten had been submitted without a REMS "came as a major surprise" because "most investors assumed the initial NDA submission already included a REMS." Barclays' analysts stated that they believed the "stock reaction was reflection of mgmt poor communication with investors" about the aficamten submission.

> We see the PDUFA delay and stock reaction as a result of mgmt's poor execution and communication.
>
> [. . .]
>
> Earlier today CYTK announced that the FDA extended the PDUFA date . . . . *The news came as a* ***major surprise*** *since* ***most investors assumed the initial NDA submission already included a REMS***. The delay was a reflection of poor execution from mgmt and ***the stock reaction was a reflection of mgmt poor communication with investors***, in our view.

67. On May 1, 2025, analysts at Morgan Stanely likewise published a report emphasizing that the NDA for aficamten was submitted "***without an accompanying REMS***" (emphasis in original). The report also emphasized that the corresponding NDA for the similar drug mavacamten was submitted with a REMS, and asked "why did the aficamten NDA not include an accompanying REMS?":

> PDUFA date for aficamten in obstructive hypertrophic cardiomyopathy (oHCM) delayed 3-months to 12/26/25 (prior 9/26/25). Based on the press release, Cytokinetics submitted the NDA for aficamten in oHCM ***without an accompanying REMS*** . . . . [. . .] ***A REMS program was included in the initial application for mavacamten.*** [. . .] We are focused on the following: (1) ***why did the aficamten NDA not include an accompanying REMS*** . . . .
>
> (Emphasis in original.)

68. On May 1, 2025, CGS International also issued a report following Cytokinetics' news that aficamten received a PDUFA delay. The report stated that Cytokinetics' failure to include the proposed REMS in the initial submission for aficamten was "puzzling" and criticized the lack of "transparency of the submission," which they believed would cause "negative investor sentiment":

> Cytokinetics disclosed that they recently submitted a proposed REMS and that they had not included a REMS protocol in the initial NDA submission, with the delay related to the REMS review.
>
> [. . .]
>
> **[W]e note the proposed REMS not being in the initial submission for aficamten is puzzling. We anticipate negative investor sentiment on the execution/transparency of the submission** . . . .
>
> [Emphasis added].

69. On May 2, 2025, analysts at Needham likewise published a report stating that "most investors will be surprised to learn that CYTK did not submit a REMS as part of the NDA submission":

> **Most investors will be surprised to learn CYTK did not submit a REMS** as part of the NDA submission in 3Q24. **This is a departure from investor expectations** that assumed aficamten would receive FDA approval with a REMS, one potentially differentiated vs. mavacamten.

70. Notably, on May 2, 2025, analysts at H.C. Wainwright & Co. published a report making clear that these analysts had understood Cytokinetics to have promised all along that it had

submitted a REMS with its initial NDA, and these analysts continued to believe that Cytokinetics had submitted a REMS with its initial NDA even after Cytokinetics May 1, 2025 announcement. The analysts stated:

> The agency recently notified the company that additional time is required to conduct a full review of **aficamten's proposed** Risk Evaluation and Mitigation Strategy **(REMS),** ***which was included in the initial NDA submission*** **package**.

**2. May 6, 2025 Disclosures**

71. On May 6, 2025, Cytokinetics hosted an earnings call at which CEO Blum provided additional details related to the FDA's decision to extend the Company's PDUFA date for aficamten:

> As we disclosed last week, the FDA extended the PDUFA date for the NDA for aficamten for the treatment of patients with oHCM to December 26, 2025, to provide additional time to conduct a full review of our proposed REMS. And to be clear, we had a series of three meetings with FDA ahead of our NDA submission for aficamten during which we discussed a range of topics related to the content of our submission, including safety monitoring and risk mitigation strategies. These included a top line meeting to review the results of SEQUOIA-HCM, a pre-NDA meeting to cover specific topics related to our submission and a Type B meeting during which we discussed strategies related to safety monitoring and risk mitigation in support of our NDA submission. Attending all 3 of these meetings were representatives from the Division of Cardiology and Nephrology as well as representatives from the Division of Risk Management within the Office of Surveillance and Epidemiology of FDA.
>
> As we've previously shared, these interactions provided the opportunity to discuss in detail the data supporting the safety and intrinsic pharmaceutic properties of aficamten and how they may inform approaches to manage risk and gain insight into FDA's perspectives on this matter. Given these interactions, we considered it reasonable to propose a distinct risk mitigation approach specific to aficamten and based on labeling and other tools such as voluntary education materials. However, we understood from FDA that the potential need for REMS would be a focus of the agency's review. We made the determination to take this approach because under the circumstances, we thought it was reasonable given the profile of aficamten. However, as a contingency, we developed our distinct REMS proposal, and we were well prepared to submit it, if necessary. During the NDA review, given the mechanism of aficamten, the FDA requested that we submit a REMS specific to its intrinsic properties, which we promptly provided.
>
> We recently learned from FDA that our subsequent submission of the REMS constitutes a major amendment to the NDA and will now require a standard 3 month extension to the original PDUFA action date. [. . .] We believe the results of our clinical studies, including SEQUOIA-HCM and FOREST-HCM, support a potential label and risk mitigation profile that, if approved by FDA, will differentiate aficamten.

72. These statements are in direct contrast to Defendants' prior statements in which they repeatedly implied to investors that Cytokinteics had submitted a REMS with its NDA for aficamten. As explained further below, these statements and others confirm that Defendants were well aware at all relevant times that they had not submitted a REMS with the aficamten NDA. The statements revealed, among other things, that Defendants and the Company could not be trusted to convey accurate information about the progress of their FDA drug approvals.

73. As a result, investors and analysts further devalued the Company, and Cytokinetics' stock price fell by $0.93 per share, or 2.73%, to close at $33.04 per share on May 7, 2025, on unusually heavy trading volume.

74. Analysts explained that they were surprised by Cytokinetics' additional explanation for its failure to include a REMS in its initial NDA submission, and lost confidence in management as a result of this explanation.

75. For example, analysts at Truist Securities explained that they, and the "investment community," had expected the FDA to require a REMS for aficamten, and that the "discrepancy in expectations between the investment community and the Company" about whether the FDA would require a REMS "raise[d] questions around management['s] decision not to submit REMS at the outset," and so raised questions about the Company's ability to secure a FDA approval for aficamten. The report stated:

> Following color from the 1Q EPS call, we expect continued near-term pressure . . . . [B]ased on our due-diligence, we saw less onerous REMS as base case for aficamten and believe consensus investor expectation was in-line with our thinking. The **discrepancy in expectations between the investment community and Company followed by FDA request to submit REMS raises questions around management decision not to submit REMS at the outset**, in our view and is likely to continue to pressure the stock in the near-term.

## VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

This section provides a concise catalogue of Defendants' misleading statements, actionable under Sections 10(b) and 20(a) of the Exchange Act, and the reasons those misstatements were misleading.

**A. August 8, 2024**

76. On August 8, 2024, Cytokinetics issued a press release reporting second quarter 2024 financial results. As part of the press release, Cytokinetics detailed the Company's NDA submission for aficamten, in pertinent part:

> Participated in a Type B meeting with the U.S. Food and Drug Administration (FDA) to discuss potential strategies related to safety monitoring and risk mitigation for *aficamten* and included a review of how results from SEQUOIA-HCM and intrinsic properties of *aficamten* may inform risk mitigation. **The Company expects to propose a distinct risk mitigation approach specific to *aficamten* with the New Drug Application (NDA)** for which the rolling submission is underway. The Company is on track to complete the rolling NDA submission for *aficamten* in Q3 2024.

77. The statements above were materially false and misleading because in context, the statements misled investors to believe that Cytokinetics expected to submit a REMS (a "distinct risk mitigation approach specific to aficamten") with their NDA, when in fact, Defendants did not expect at that time to submit a REMS as part of their initial NDA.

**B. November 7, 2024**

78. On November 7, 2024, Cytokinetics released their quarterly report on SEC Form 10-Q for the third quarter of 2024 "(2Q 2024 10-Q".). In the 2Q 2024 10-Q, Defendants stated:

> **Camzyos® was approved by FDA with a** comprehensive and mandatory **risk evaluation and mitigation strategy (REMS)**, including all or many of the elements to assure safe use (ETASU) that are contemplated in Section 505-1(f)(3) of the U.S. Food, Drug & Cosmetics Act. **Our proposed NDA as submitted to FDA contained a distinct risk mitigation approach specific to aficamten.** We believe that the **commercial prospects of aficamten will be highly dependent on** whether FDA approves aficamten with a **label and/or post-marketing conditions** that are **less onerous to prescribers and patients than the ETASU REMS applicable to Camzyos®**.

79. The statements above were materially false and misleading for multiple reasons. (1) In context, the statements misled investors to believe that Cytokinetics had submitted a REMS (a "distinct risk mitigation approach specific to aficamten") with their NDA, when in fact, Defendants had not submitted a REMS as part of their initial NDA. (2) The statements above contemplated that the submitted NDA for aficamten could be accepted with "post-marketing conditions" that could impose some burden on patients, and so misleadingly suggested that the NDA for aficamten was submitted with a REMS.

**C. February 27, 2025**

80. On February 27, 2025, Cytokinetics released their annual report on SEC Form 10-K for the fourth quarter and year of 2024 ("2024 10-K"). In the 2024 10-K, Defendants stated:

> The commercial success of aficamten will be highly dependent on differentiation of aficamten from Camzyos®. **Camzyos® was approved by FDA with a** comprehensive and mandatory **REMS**, including all or many of the elements to assure safe use (ETASU) that are contemplated in Section 505-1(f)(3) of the U.S. Food, Drug & Cosmetics Act. **Our proposed NDA as submitted to FDA contained a distinct risk mitigation approach specific to aficamten**. We believe the commercial prospects of aficamten are highly dependent on whether FDA approves aficamten with a label and/or post-marketing conditions that are less challenging to prescribers and patients than the REMS applicable to Camzyos®.
>
> We believe that our ability to successfully compete will depend on, among other things:
>
> [. . .]
>
> - **the imposition by FDA** or other regulatory authorities **of a REMS program that is differentiated and less burdensome** to healthcare providers, pharmacists and patients **than the REMS program to which Camzyos® is subject**;

81. The statements above were materially false and misleading for multiple reasons. (1) In context, the statements misled investors to believe that Cytokinetics had submitted a REMS (a "distinct risk mitigation approach specific to aficamten") with their NDA, when in fact, Defendants had not submitted a REMS as part of their initial NDA. (2) The statements above contemplated that the submitted NDA for aficamten could be accepted with "post-marketing conditions" that could impose some burden on patients, and so misleadingly suggested that the NDA for aficamten was submitted with a REMS. (3) Defendants' statement that "we believe our ability to successfully compete will depend on . . . the imposition by FDA . . . of a REMS program that is differentiated" implies that the FDA will impose a REMS for aficamten, and so implies that Cytokinetics had submitted a REMS for aficamten for the FDA to consider and impose.

82. On the February 27, 2025 earnings call, analyst James Condulis from Stifel asked Defendant Blum and Andrew Callos a "quick question on the REMS" for aficamten.

> [W]anted to get your thoughts on if you expect mavacamten's REMS to be eased in the U. S. as well and sort **of if that happens like how does that change how you sort of think about the range of scenarios for kind of what aficamten's REMS looks like?**

> **Again, sort of like in that scenario, would you define differentiated REMS as still differentiated in sort of the maintenance setting as well? Or does that become more about some of the other aspects of the REMS?**

Defendant Blum replied:

> **[T]here are points of differentiation** that we continue to believe are quite meaningfully important for aficamten as are consistent with intrinsic properties. And echo frequency is one of those, but so are there several others.[2]

83. The statements above were materially false and misleading because, read in context as a direct response to Condulis' question, Defendant Blum implied that there were points of differentiation between "aficamten's REMS" and "mavacamten's REMS," and so misleadingly implied that a REMS for aficamten existed and had been submitted as part of the aficamten NDA.

## VII. LOSS CAUSATION

84. This section explains how the allegations of this complaint satisfy the loss causation requirement of Section 10(b) of the Exchange Act.

85. Throughout the Class Period, Defendants' materially false and misleading statements and omissions caused the price of Cytokinetics' common stock to be artificially inflated. Lead Plaintiff and other Class members purchased Cytokinetics' common stock at those artificially inflated prices.

86. Through partial corrective disclosures, and materializations of concealed risks, investors and the market learned of the artificial inflation of the prices of Cytokinetics' common stock. Lead Plaintiff and Class members suffered losses when the prices of Cytokinetics' stock fell in response to the corrective events on May 1, 2025 and May 6, 2025 and eliminated this artificial inflation.

### A. May 1, 2025

87. On May 1, 2025, as detailed above, Cytokinetics published a press release announcing the FDA's decision to delay the Company's PDUFA date for aficamten by three months, from September 26, 2025 to December 26, 2025. The press release revealed that Cytokinetics had failed to submit a REMS with its NDA for aficamten.

---

[2] "Echo frequency" refers in this context to how often a patient requires an echocardiogram to monitor for potential side effects on the heart from medications like aficamten or mavacamten.

88. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, Cytokinetics' stock price fell by $5.57 per share, or 12.97%, to close at $37.35 per share on May 2, 2025.

### B. May 6, 2025

89. On May 6, 2025, during a quarterly earnings call, Cytokinetics' management disclosed that the Company had participated in multiple meetings with the FDA regarding its aficamten NDA and had even prepared a REMS, but chose not to submit it to the FDA, as detailed above. These disclosures revealed, among other things, that management had not acted competently or transparently, and caused investors to lose confidence in management.

90. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, Cytokinetics' stock price fell by $0.93 per share, or 2.73%, to close at $33.04 per share on May 7, 2025.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

This section provides additional allegations showing that the scienter requirement of Section 10(b) of the Exchange Act is satisfied.

### A. Defendants Have Admitted That They Crafted Their Misstatements Deliberately with Full Knowledge That the Aficamten NDA Was Submitted Without a REMS

91. On May 7, 2025, on the Q1 2025 earnings call with investors, Tessa Romero, an analyst at JP Morgan, asked Defendant Blum about Defendants' failure to disclose that Cytokinetics had submitted an NDA without a REMS: "I'm just curious why a disclosure wasn't made back when you submitted the NDA that there was no REMS that was submitted."

92. In response, Defendant Blum outright admitted that he and the other Defendants were fully aware that they had submitted the aficamten NDA without a REMS when they drafted language informing investors that the NDA for aficamten "contained a distinct risk mitigation approach specific to aficamten." Defendant Blum stated:

> We didn't think that was information that required disclosure. In fact, instead, **because we did not submit a REMS, we were very disciplined about what we were saying that we believe, upon approval, that aficamten would carry a differentiated safety and risk mitigation profile**.

> **You'll note that we did not say with REMS or we did not say without REMS.** But only upon asking for us to submit a REMS, did we then submit the REMS, and we began communicating now differently, so that we expect the differentiation would be within the REMS.

93. In these statements, Defendant Blum admitted that Defendants ("we") knew that the Company submitted the NDA for aficamten without a REMS. Indeed, Defendant Blum admitted in these statements that Defendants were intentional and deliberate ("very disciplined") in crafting the language they used to discuss what was submitted as part of the NDA for aficamten.

94. In fact, Defendant Blum and the other Defendants deliberately crafted language to mislead investors to believe that the Company had submitted a REMS with their NDA for aficamten. Defendants later sought to justify this misleading conduct by claiming that the Company did not expressly say that the NDA was submitted "with REMS" or "without REMS."

### B. Defendants Have Admitted That They Had Decided Prior to August 8, 2024 Not To Submit Aficamten with a REMS

95. On the May 7, 2025 earnings call with investors, analyst Srikripa Devarakonda from Truist asked Defendant Blum:

> You said you did not receive any guidance from FDA to submit REMS, whereas mavacamten, they did receive guidance. But you also said that during these meetings, the three meetings that you talked about, they give feedback in response to questions. So, based on what you're saying, is it fair to assume that you asked the FDA if you should submit the REMS? And then, based on the feedback, you concluded that it was fair not to submit the REMS program.

96. In response, Defendant Blum stated, "I think that's correct."

97. With this statement, Defendant Blum admitted that he and the other Defendants decided at or around the time of their Type B meeting with the FDA not to submit a REMS with the NDA for aficamten. The Company's Type B meeting with the FDA occurred well prior to the first misrepresentation at issue, on August 8, 2024. Accordingly, when Defendants stated on August 8, 2024 that they expected to submit a "distinct risk mitigation approach specific to aficamten," and so suggested to investors that they expected to submit a REMS with the aficamten NDA, Defendants knew that in fact they did not expect to submit a REMS with the aficamten NDA and that their statement suggesting the contrary was misleading.

98. Also in these statements, Defendant Blum admitted that he attended the meetings

with the FDA concerning the FDA's approval of aficamten. Multiple former employees have confirmed that Defendant Blum and/or his direct reports attended the three meetings in 2024 with the FDA regarding aficamten, including the Type B meeting that took place prior to August 2024. One former employee ("FE1") worked at Cytokinetics from January 2023 through December 2023 as a Senior Manager in Clinical Outsourcing. In this job, FE1 was responsible for overseeing the outsourcing of clinical trial activities to external vendors. According to FE1, Blum would have attended the FDA meetings regarding the NDA for aficamten. Other attendees, according to FE1, likely included Steve Heightner (VP of Clinical Research), Fady Malik (EVP of Research & Development), and Polina German (VP of Clinical Pharmacology), all of whom either directly reported to Blum or were one level below Blum in the Company's organizational hierarchy.

99. Another former employee ("FE2") has confirmed that, if Defendant Blum for some reason had not attended the meetings with the FDA concerning the approval of aficamten (Blum has admitted he did), Blum nevertheless would have been briefed on the discussions immediately afterwards. FE2 worked at Cytokinetics from October 2022 to April 2023 as a Case Safety Management Consultant. In this role, FE2 developed and revised global pharmacovigilance policies and procedures. FE2 has extensive experience with REMSs and has created training modules on FDA pharmacovigilance. According to FE2, at a minimum, Blum would have to be briefed on any FDA meetings he did not personally attend because the Board of Cytokinetics expects current, complete and accurate information concerning regulatory matters.

### C. Defendants Knew That the FDA Would Almost Certainly Require a REMS for Aficamten Because Defendants Knew About the FDA's REMS for Camyzos

100. Defendants knew that the FDA was likely to require a REMS for aficamten because, according to former employees, Defendants (like everyone involved in the afficamten approval process) knew that afficamten's competitor drug, mavacamten, was approved only with a REMS.

101. A former employee ("FE3") has stated as much. FE3 worked at Cytokinetics from August 2019 to March 2023 as Director of Marketing. FE3's job responsibilities included

developing brand and go-to-market strategies for the launch of omecamtiv mecarbil, a cardiovascular drug. In this role, FE3 was assigned responsibility for managing omecamtiv mecarbil's proposed REMS program. According to FE3, everyone at Cytokinetics involved in the approval of aficamten was aware, through industry communications, that Bristol Myers Squibb had implemented a REMS for mavacamten, aficamten's sole directly competitive drug. According to FE3, given the similarities of mavacamten and aficamten, everyone involved in aficamten's approval would have actively planned and prepared for the FDA to require a REMS for aficamten as well. More generally, FE3 noted that drugs with the risk profile of aficamten generally required a REMS. FE3 was surprised that Cytokinetics did not submit a REMS along with its NDA for aficamten.

102. Another former employee, FE2, has confirmed that when a competitor drug already carries a REMS, a sponsor developing a similar product should assume that it will be held to the same standard, as in practice, they almost always are. According to FE2, once the FDA has set a precedent for a REMS for a particular type of drug, the agency is unlikely to deviate from it. Therefore, according to FE2, Defendants should have anticipated that the FDA would require a REMS for aficamten given that it already had required a REMS for the similar drug mavacamten.

**D. The FDA's Approval of Aficamten Was a Core Operation of the Company**

103. The fate of Cytokinetics turned on the FDA's approval of the NDA aficamten, so the approval of this drug was a core operation of the Company—it would be absurd to suggest that Defendants were not aware of major aspects of this approval process, including the fact that the NDA for aficatmen was submitted without a REMS.

104. FE3 has emphasized the importance of aficamten to Cytokinetics' business. According to FE3, "the Company's future was entirely dependent on the success of aficamten." Aficamten was expected to account for all of Cytokinetic's revenue, FE3 stated. FE3 described aficamten as "simply the most important thing in the Company." The company built new commercial infrastructure, prepared for a product launch, hired a sales force, and conducted market assessments to support the successful introduction of aficamten.

## IX. CLASS ACTION ALLEGATIONS

105. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased or otherwise acquired Cytokinetics securities publicly traded on the NASDAQ during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

106. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cytokinetics securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

107. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law.

108. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

109. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged in this Complaint;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;
- whether the prices of Cytokinetics securities during the Class Period were artificially inflated because of the Defendants' conduct alleged in this Complaint; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

110. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

111. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Cytokinetics securities are traded in efficient markets;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased and/or sold Cytokinetics securities between the time the Defendants failed to disclose or misrepresented material facts and the time the facts were disclosed, without knowledge of the omitted or misrepresented facts.

112. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

113. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## X. COUNT ONE

***For Violation Of Section 10(B) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)***

114. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth again here.

115. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

116. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. This scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members;

(ii) artificially inflate and maintain the market price of Cytokinetics common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Cytokinetics' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions in this complaint.

117. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Cytokinetics' securities. These reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

118. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. These acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

119. Some information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As senior managers of the Company, the Individual Defendants had knowledge of the details of Cytokinetics' internal affairs.

120. The Individual Defendants are liable both directly and indirectly for the wrongs in this complaint. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Cytokinetics' businesses, operations, future

financial condition and future prospects. As a result of the dissemination of these false and misleading reports, releases and public statements, the market price of Cytokinetics' common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company that were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Cytokinetics' common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

121. During the Class Period, Cytokinetics' common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements stated above, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Cytokinetics' common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired this common stock, or would not have purchased or otherwise acquired the stock at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Cytokinetics' common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Cytokinetics' common stock declined sharply upon public disclosure of the facts alleged, to the injury of Plaintiff and Class members.

122. By reason of the conduct alleged, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

123. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## XI. COUNT TWO

***For Violation Of Section 20(A) of the Exchange Act (Against The Individual Defendants)***

124. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth again here.

125. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior position, they knew the adverse non-public information about Cytokinetics' misstatements.

126. As officer and/or director of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Cytokinetics which had become materially false or misleading.

127. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Cytokinetics disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Cytokinetics to engage in the wrongful acts in this complaint. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged that artificially inflated the market price of Cytokinetics' common stock.

128. By reason of their senior management positions and/or being director of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Cytokinetics to engage in the unlawful acts and conduct in this complaint. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities that comprise the primary violations in this complaint.

129. By reason of the above conduct, the Individual Defendants and/or Cytokinetics are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XIII. JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 10, 2026

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Austin P. Van*

Jeremy A. Lieberman (admitted *pro hac vice*)
Austin P. Van (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
E-mail: jalieberman@pomlaw.com
avan@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405 7190
Facsimile: (917) 463 1044
E-mail: jpafiti@pomlaw.com

*Counsel for Lead Plaintiff*

The Schall Law Firm
Brian Schall, Esq.
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*

**CERTIFICATE OF SERVICE**

I, Austin P. Van, certify that a true and correct copy of the foregoing Amended Class Action Complaint for Violations of the Federal Securities Laws was filed electronically on March 10, 2026. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Austin P. Van*
Austin P. Van